# Exhibit B

# Exhibit B-1

6/15/2020 4:23 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 43754997
By: Carolina Salgado
Filed: 6/15/2020 4:23 PM

# 2020-35770 / Court: 281

CAUSE NO. _____

| | | |
|---|---|---|
| RYAN, LLC | § | IN THE DISTRICT COURT OF |
|     Plaintiff, | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| ERNST & YOUNG, LLP AND | § | |
| S.K. THAKKAR | § | |
|     Defendants. | § | _____ JUDICIAL DISTRICT |

### RYAN, LLC'S VERIFIED ORIGINAL PETITION, APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND REQUEST FOR PERMANENT INJUNCTION

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Ryan, LLC files this Verified Original Petition[1] and shows:

### STATEMENT OF THE CASE

Ryan, LLC ("Ryan") is a Texas-based accounting and consulting firm. Ryan has strategically developed its oil and gas severance tax and royalty practice group, and that group serves most of the oil and gas companies in the Fortune 500, helping those companies realize savings and obtain refunds of federal and state taxes and royalties. While federal income tax laws apply uniformly across the country and are widely understood and litigated, severance taxes and federal royalties are not. Through its deliberate focus on and experience in this area, Ryan has developed trade secrets and confidential methodologies to efficiently navigate a patchwork of disparate state and federal laws, state and federal regulatory guidance, opinion letters, and state comptroller and auditor positions to achieve significant benefits for clients.

---

[1] The facts in this Petition are verified by the Declaration of Steve Dudgeon, a principal of Ryan. *See* Exhibit "A."

Ernst & Young, LLP ("EY") is a global audit, accounting, and consulting firm with more than 280,000 employees worldwide that provides audit services for public companies. Ryan recently learned that EY's audit group has repeatedly demanded from energy clients – who are also Ryan's severance tax and royalty clients – Ryan's work papers that include Ryan's trade secrets and are subject to a confidentiality agreement underlying these clients' severance tax and royalty filings. Ryan is aware of at least one instance in which EY's audit group has obtained Ryan's confidential work papers. Further, in violation of fundamental accounting rules prohibiting auditors such as EY from using their attest function to profit from consulting services, an EY consultant – S.K. Thakkar ("Thakkar") – has used Ryan's work papers to interfere with Ryan's relationships with its clients.

Ryan seeks relief for EY's and Thakkar's theft and misuse of Ryan's trade secrets and tortious interference with client relationships.

## 1.

## <u>DISCOVERY CONTROL</u>

1.1.    Ryan intends to conduct discovery in this action under Level 3. Tex. R. Civ. P. 190.4.

## 2.

## <u>RELIEF</u>

2.1.    Ryan seeks injunctive relief and monetary relief valuing more than $1,000,000.00. Tex. R. Civ. P. 47(c)(5).

## 3.

## <u>PARTIES</u>

3.1.    Ryan, LLC is a Delaware limited liability company with its principal place of business at Three Galleria Tower, 13155 Noel Road, Suite 100, Dallas, Texas 75240.

3.2.    Ernst & Young, LLP ("EY") is a Delaware limited liability partnership that is registered to do business in Texas. EY may be served with citation through its registered agent, National Registered Agents, Inc., at 1999 Bryan St., Suite 900, Dallas, Texas 75201.

3.3.    Saurabh K. Thakkar ("Thakkar") is an individual resident of Fort Bend County, Texas. Thakkar may be served with citation at his home, located at 5335 Fenwick Way Ct., Sugar Land, Texas 77479, or at his EY office, located at 1401 McKinney Street, Suite 2400, Houston, Texas 77010.

**4.**

**JURISDICTION AND VENUE**

4.1.    Subject matter jurisdiction is proper in this Court because Texas district courts are courts of general jurisdiction. TEX. CONST. ART. 5 § 8; TEX. GOV'T CODE §24.007; TEX. GOV'T CODE § 24.011.

4.2.    This Court has general personal jurisdiction over EY because it transacts business in Texas and because Thakkar resides in Texas. Additionally, personal jurisdiction is appropriate because this action arises out of actions of EY and Thakkar that occurred in Harris County, Texas, and the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice.

4.3.    Ryan seeks monetary and non-monetary relief, and the relief sought is within the jurisdictional limits of this Court.

4.4.    Venue is proper in Harris County because this is where a substantial part of the events or omissions giving rise to Ryan claims occurred. TEX. CIV. PRAC. & REM. CODE § 15.002(a)(1).  Further, on information and belief, venue is proper in Harris County because it is the county of EY's principal office in Texas. TEX. CIV. PRAC. & REM. CODE § 15.002(a)(3). Additionally, venue is proper pursuant to Texas Civil Practice and Remedies Code § 15.005.

**5.**

**FACTUAL BACKGROUND**

5.1.    Ryan is a Texas-based tax services, technology, and consulting firm, and a leading provider of advisory services related to the reduction of oil and gas severance taxes, and taxes or royalties on federal oil, gas, and mineral royalty interests. Through the use of its full suite of proprietary tools and experienced professionals, Ryan's oil and gas severance tax and federal royalty practice represents major oil and gas companies, both Fortune 500 and independent, with services related to reducing oil and gas severance taxes and royalty obligations, navigating complex state and federal audit processes, and consulting on severance tax and royalty issues and tax planning to minimize liability, including preparation of tax returns and preparing refund claims for overpayments.

5.2.    Effective November 30, 2016, Ryan acquired Shiv Om Consultants, LLC ("SOC").

5.3.    Prior to Ryan's acquisition of SOC, Thakkar was employed by SOC as a Project Manager. As a condition to employment with SOC, Thakkar executed an Employment Agreement, dated October 15, 2014, wherein Thakkar agreed, among other things, to maintain the confidential information of SOC and its clients, and to not disclose [SOC]'s proprietary information, as well as to not, directly or indirectly, for the purpose of competing, become an employee of or participate in or be connected with any competitive business or entity within a defined geographic area, or solicit any then current clients or employees of SOC for a period of three years following his termination from SOC. The Employment Agreement inured to the benefit of SOC's successors and assigns. On March 4, 2016, Thakkar signed an amendment to his Employment Agreement, effective January 1, 2016, modifying in part, but reaffirming the remainder of his Employment Agreement, including those restrictive covenants requiring strict confidentiality, noncompetition, and nonsolicitation.

-4-

5.4.    On November 3, 2016, Thakkar resigned from SOC. Several months after his resignation, Thakkar was hired by EY as a "Senior Manager" in that firm's "Severance Tax" group.

5.5.    Immediately upon learning of this development, Ryan sought written confirmation from EY that Thakkar had "not retained or misused any of [SOC]'s confidential information or proprietary methodologies," nor had he "engaged in the Business" of acting as an adviser and consultant to major integrated oil companies and independents, with services respecting oil and gas severance taxes and royalty obligations in violation of the restrictive covenants in the Employment Agreement and existing obligations SOC. In a response dated September 12, 2017, EY represented that Thakkar was not in breach of any restrictive covenants or continuing obligations in the Employment Agreement.

5.6.    In 2018, still within the term of the restrictive time period, Ryan became concerned that Thakkar was in breach of his confidentiality, noncompetition, and nonsolicitation restrictions of his Employment Agreement. Ryan initiated proceedings against Thakkar in Fort Bend County District Court  in *In re Ryan, LLC* with Cause No. 19-CV-259671. To resolve that dispute, both EY (through its Associate General Counsel Peter J. Cahill) and Thakkar represented by letter, dated April 26, 2019, that Thakkar had complied and would continue to comply with the restrictive covenants of his Employment Agreement with SOC and had not misused "confidential information and proprietary methodologies" belonging to Ryan, as successor in interest to SOC.

5.7.    In November 2019, Ryan was made aware of Thakkar pitching EY's federal royalty services to Ryan's own clients and indicating he had firsthand knowledge of Ryan's work and that the client would be disappointed by Ryan's deliverables. Critically, Thakkar had never been employed by Ryan, so he would have no firsthand knowledge from working with Ryan. However, Ryan later became aware that EY's audit group had demanded Ryan's work papers from its

severance tax and federal royalty clients and provided them to Thakkar. The client's information regarding Thakkar's solicitation was the first time Ryan encountered EY as a competitor in the federal royalty services space.

5.8.     Ryan's severance tax and federal royalty group has demonstratively dedicated years to the development of confidential models and proprietary methodologies derived from experience, including countless interactions with state and federal tax and royalty authorities, extensive research, and mutually agreed upon guidance documents developed in collaboration with the U.S. Department of the Interior. Ryan combines its models and methodologies with detailed data analysis to maximize recovery for or limit liability of its clients. The information contained in Ryan's work product is not commonly known, ascertainable by the general public, or readily comprehensible without the benefit of experience, both in time and money expended, and the context of the information aggregated and organized from research conducted by Ryan's employees that has provided a substantial competitive advantage for Ryan in the marketplace.

5.9.     In recognition of that effort, Ryan similarly requires a confidentiality agreement and obligation with each client it engages, substantially similar to the following:

> "Ryan's work product, including specific engagement procedures and techniques, constitutes proprietary and exclusive information, and Client further agrees not to disclose such information to any third party without obtaining prior written approval from Ryan. Further, Ryan's tax saving strategies constitute proprietary and exclusive information."

After confidentiality is ensured, Ryan and its clients work closely together, exchanging confidential and proprietary work product such as accounting work papers, schedules, and spreadsheets that Ryan and its clients maintain and protect. Ryan's clients are obligated to maintain the secrecy of Ryan's trade secrets and work product.

5.10.   Ryan also requires that its employees execute confidentiality agreements or imposes restrictive covenants in employment agreements that preclude employees from soliciting business from Ryan clients for a defined period following separation from Ryan.

5.11.   Ryan's work product is intended to remain confidential and, per the engagement agreements with Ryan's clients, should not be shared with EY unless expressly permitted to do so by Ryan – a fact that has been acknowledged by EY to other Ryan clients. Similarly, and as an auditor to Ryan's clients, EY is prohibited from sharing confidential information with non-audit EY employees outside of the attest function to verify and report that certain tax treatments accurately reflected the clients' accounting.

5.12.   Under Texas law, EY must abide by the Uniform Accountancy Act, which expressly provides that it is unlawful for an accountant to offer or recommend that the client also pay for other services, such as federal royalty services, whether for commission or contingency fee, when that accountant also provides audit services to the client.

5.13.   Accordingly, EY was on notice that: (1) its audit teams should not share confidential information with non-attest members; and (2) based on Texas law, EY should not perform nor offer severance tax or federal royalty services for any audit client.

5.14.   Despite being on notice that Ryan's information was protected information and that EY should not use its position as auditor to solicit non-audit work, EY's audit team accessed and acquired Ryan's confidential work product without Ryan's knowledge or consent from a mutual client. To obtain the work product, EY's team requested Ryan's confidential work product from a mutual client under the guise of the documents being necessary for the team to complete the audited financials for the client. Ryan's client feared that EY would refuse to produce audited

financials unless the documents were turned over, so it acquiesced. The audit team then forwarded the documents to Thakkar, who posed as a severance tax "specialist" for the purposes of deciphering Ryan's work product.

5.15.   Since then, Thakkar and EY have presumably attempted to reverse-engineer the unlawfully obtained work product for the purposes of developing EY's fledgling federal oil and gas royalty offerings. To Ryan's knowledge, EY did not market nor offer federal oil and gas royalty services prior to Thakkar obtaining, disseminating, and utilizing Ryan's work product, which, along with historical engagements in the industry, indicate EY does not possess the knowledge, skills, or expertise to compete with Ryan in providing federal royalty services. Thakkar's use of EY's audit services to obtain Ryan's trade secret information and market EY's severance tax and royalty services is unlawful, a breach of Thakkar's continuing obligations under the Employment Agreement, and EY is liable for Thakkar's ongoing unlawful conduct.

5.16.   Thakkar has proceeded without caution in the marketing of Ryan's confidential and proprietary information. Thakkar has approached mutual clients, indicating he has seen "Ryan's work" and offered to perform federal royalty services on an hourly basis. Further, on information received by Ryan, Thakkar has attempted to undermine Ryan's existing contracts with its clients by defaming Ryan as doing "bad work" and alleging Ryan "hides" solutions. This is all based on Thakkar's illegal acquisition and use of Ryan's work product and is false.

5.17.   Of additional concern is Thakkar's and EY's ongoing and continued demands for Ryan clients to provide Ryan's confidential and proprietary work product to EY's audit teams. By way of example, a Ryan client that acceded to EY's demand and provided EY with Ryan's confidential and proprietary work product has continually been harassed by similar demands from

EY's audit team and rudimentary questions relating to the client's federal royalty schedules. This unlawful behavior continues despite at least one EY audit partner acknowledging the actions and assuring EY would address the problem internally.

5.18.   Further underscoring the illegitimate and illegal nature of the audit team's requests, another mutual client approached by EY refused to provide the requested Ryan information, citing the confidentiality obligations and the lack of any legitimate and lawful purpose in EY's requests. For this client that refused EY's requests, EY has issued audited financials without qualification. This inconsistency between similarly-situated attest EY clients proves that EY's requests for Ryan's work papers serve no legitimate audit purpose.

5.19.   Accordingly, Thakkar and EY have misappropriated Ryan trade secret information, done so in an unlawful manner, knowingly and with intent to harm Ryan.

**6.**

## COUNT I: MISAPPROPRIATION OF TRADE SECRETS

6.1.   Ryan incorporates the preceding paragraphs as if fully stated herein.

6.2.   Thakkar, on behalf of EY, is illegally using Ryan's confidential, proprietary trade secret information to improperly compete against Ryan in violation of the Texas Uniform Trade Secret Act ("TUTSA").

6.3.   Ryan's confidential and proprietary methodologies derive substantial, independent economic value from not being generally known to the public or to its competitors, who could obtain economic value from this information. Ryan expended significant financial and human resources to obtain and/or develop this information, which cannot be easily acquired or replicated by others. Moreover, Ryan has taken substantial efforts to maintain the secrecy of this information,

including, but not limited to, restricting access to such information, designating such information as confidential, and requiring confidentiality agreements. As such, Ryan's confidential and proprietary information constitutes trade secrets pursuant to TUTSA and common law.

6.4.    Thakkar and EY misappropriated Ryan's trade secret information and knew or had reason to know the use or disclosure of the trade secret information was unlawful and in violation of Thakkar's Employment Agreement.

6.5.    Ryan was injured and continues to be injured as a direct result of Thakkar's and EY's ongoing conduct and therefore seeks actual damages (including, but not limited to, lost profits), fee forfeiture and disgorgement, a constructive trust (and other equitable remedies).

6.6.    Thakkar's and EY's misappropriation of trade secrets was willful and malicious and thus justifies an award of exemplary damages, which Ryan also seeks.

**7.**

**COUNT II: TORTIOUS INTERFERENCE WITH CONTRACT**

7.1.    Ryan incorporates the preceding paragraphs as if fully stated herein.

7.2.    EY is liable to Ryan for tortiously interfering with Ryan's present and prospective business relationships with Ryan clients.

7.3.    Ryan's agreements with its clients are valid and enforceable contracts.

7.4.    EY's tortious interference was and continues to be a proximate cause of damages to Ryan, which continues to accrue and cause irreparable harm to Ryan.

7.5.    EY's and Thakkar's conduct was malicious and carried out with such intent that it justifies the imposition of punitive damages against EY sufficient to punish and deter EY from similar conduct in the future.

**8.**

**COUNT III: BREACH OF CONTRACT**

8.1.    Ryan incorporates the preceding paragraphs as if fully stated herein.

8.2.    The Employment Agreement constitutes a valid and binding contract, which obligated Thakkar to not disclose confidential information received in the course of his employment. Thakkar's obligations under the Employment Agreement to not disclose confidential information did not terminate on his resignation, nor on the expiration of his non-compete term.

8.3.    Ryan as successor to SOC possesses the right to enforce the Employment Agreement.

8.4.    Thakkar has materially breached the Employment Agreement by disclosing Ryan's confidential information.

8.5.    Thakkar's breach of the Employment Agreement caused injury to Ryan.

8.6.    As a direct result of Thakkar's breach of the Employment Agreement, Ryan seeks damages to be proven in excess of $1,000,000.

**9.**

**APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND TEMPORARY INJUNCTION**

9.1.    Due to Defendants' conduct set out above, Ryan is threatened with imminent harm and irreparable injury. Ryan is threatened with imminent harm because Defendants abused its audit relationships to: a) misappropriate customer relationships belonging to Ryan; b) misappropriate confidential information and trade secrets belonging to Ryan related to Ryan's provision of severance tax and federal oil and gas royalty services, customer relationships, and other matters; and c) usurp business opportunities belonging to Ryan. This wrongful conduct has already harmed Ryan considerably. Given the events already past, and the course of conduct currently unfolding,

-11-

this harm is likely to greatly increase in the immediate future if Defendants are not enjoined as requested herein. Among other things, Ryan has and will likely continue to lose confidential and proprietary processes, methodologies, information and trade secrets, in addition to loss of business and suffer a loss of goodwill and customer relationships.

9.2.     Ryan is also threatened with irreparable injury. As set forth above, if Defendants are not enjoined as requested herein, Ryan's confidential and proprietary processes and methodologies and trade secrets will be learned and deployed by a competitor, causing a loss of goodwill and untold future customers. Additionally, confidential information belonging to Ryan is likely to be used to unlawfully compete with Ryan. These circumstances give Defendants an unfair advantage over Ryan in the marketplace, which have and will continue to harm Ryan's relationships with customers. The full economic damage caused by this activity will be difficult or impossible to fully calculate.

9.3.     If Defendants are not enjoined as requested herein, Ryan will have no adequate remedy at law. Even if monetary damages are awarded, they will not undo the damage and ongoing harm caused by Defendants continuing to use Ryan's confidential and proprietary knowledge, methodologies, and trade secrets to unlawfully disrupt Ryan's business. Also, as noted above, the economic harm Ryan will suffer will be difficult or impossible to fully calculate. Additionally, Defendant Thakkar is unlikely to be able to pay a judgment for damages for the harm Ryan is likely to suffer. Consequently, the potential recovery of a monetary judgment after trial will not make Ryan whole and will not be an adequate remedy at law.

9.4.     As an additional ground for injunctive relief, section 65.011 of the Texas Civil Practice and Remedies Code provides that injunctive relief may be granted if: 1) the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act

prejudicial to the applicant; or 2) a party performs or is about to perform or is procuring or allowing the performance of an act relating to the subject of pending litigation, in violation of the rights of the applicant, and the act would tend to render the judgment in that litigation ineffectual. TEX. CIV. PRAC. & REM. CODE § 65.011. Based on the facts alleged above, injunctive relief is warranted under either or both of those provisions

9.5.    Based on the foregoing, Ryan requests that the Court enter temporary and permanent injunctions, prohibiting Defendants from, directly or indirectly, alone or in conjunction with others:

    a.    Retaining, using, or disclosing any of Ryan's confidential and/or proprietary information obtained from Ryan and Ryan's customers, including, but not limited to, Ryan's work papers reflecting Ryan's severance tax work and calculations and Ryan's federal oil and gas royalties work and calculations;

    b.    seeking any additional Ryan work papers, confidential information, or other Ryan information from Ryan's customers for purposes of providing that information to persons providing severance tax services and federal oil and gas royalties services; and

    c.    compelling EY to return to Ryan or Ryan's customers all of Ryan's confidential information and work papers obtained from Ryan or Ryan's customers relating to severance tax services and federal oil and gas royalties services.

9.6.    Ryan requests that these injunctions be binding upon the named enjoined persons, and to their officers, agents, representatives, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual or constructive notice of the injunction by personal service or otherwise.

9.7.    Ryan is willing to post a bond in a just and reasonable amount set by the Court.

**10.**

**PERMANENT INJUNCTION**

10.1.   Ryan seeks a permanent injunction prohibiting Defendants from, directly or indirectly, alone or in conjunction with others:

      a.      Retaining, using, or disclosing any of Ryan's confidential and/or proprietary information obtained from Ryan and Ryan's customers, including, but not limited to, Ryan's work papers reflecting Ryan's severance tax work and calculations and Ryan's federal oil and gas royalties work and calculations;

      b.      seeking any additional Ryan work papers, confidential information, or other Ryan information from Ryan's customers for purposes of providing that information to persons providing severance tax services and federal oil and gas royalties services; and

      c.      compelling EY to return to Ryan or Ryan's customers all of Ryan's confidential information and work papers obtained from Ryan or Ryan's customers relating to severance tax services and federal oil and gas royalties services.

**11.**

**ATTORNEYS' FEES**

11.1.   Ryan incorporates the preceding paragraphs as if fully stated herein.

11.2.   Pursuant to Texas Civil Practice and Remedies Code §§ 38.0001, 134A.003 – .005, Ryan is entitled to recover its reasonable attorneys' fees and expenses incurred in prosecuting its claims against EY and Thakkar.

11.3.   Ryan has performed the conditions precedent necessary for the recovery of attorneys' fees from EY and Thakkar.

## 12.

## RESPONDEAT SUPERIOR

12.1.    Ryan incorporates the preceding paragraphs as if fully stated herein.

12.2.    All of Thakkar's conduct alleged herein has occurred in the course and scope of his employment with EY, and EY had knowledge and supported all conduct alleged herein.

## 13.

## CONDITIONS PRECEDENT

13.1.    All conditions precedent to Ryan's right to recover on the claims and recover attorneys' fees stated herein were met, otherwise occurred, or were waived.

## 14.

## RESERVATION OF RIGHTS

14.1.    Ryan reserves its rights under Texas law to assert additional claims and remedies, including temporary or permanent injunctive relief.

## 15.

## REQUEST FOR EXPEDITED DISCOVERY

15.1.    To prepare for the temporary injunction hearing in this action and based on Defendants' actions and need to protect Ryan's trade secrets and confidential information, Ryan seeks limited, expedited discovery. This Court has discretion to schedule discovery and may shorten or lengthen the time for making a response for good cause. *In re Colonial Pipeline Co.*, 968 S.W.2d 938, 943 (Tex. 1998) (orig. proceeding). The appropriate standard for expedited discovery is reasonableness or good cause.  *See id*. at 941. Expedited discovery is appropriate

when, as here, an application for preliminary injunction is pending. *See In re Nat'l Lloyds Ins. Co.*, 13-15-00390-CV, 2015 WL 6759153, at *4 (Tex. App.—Corpus Christi Nov. 3, 2015, no pet.) ("Parties frequently seek, and trial courts order, expedited discovery in the course of proceedings pertaining to temporary restraining orders.").

15.2.    Ryan requests expedited discovery to prepare for the temporary injunction hearing. First, Ryan asks the Court to order the Defendants to respond to the document requests attached as Exhibit "B" within five days of service. These document requests are limited in number, time, and scope to issues concerning Ryan's Application for Temporary Injunction. Second, Ryan requests that it be permitted to take the deposition of Thakkar and an EY corporate representative for up to two hours per deposition, without prejudice to utilizing the remaining time available for each under the Texas Rules of Civil Procedure at a later date.

**16.**

**REQUEST FOR DISCLOSURE**

16.1.    Pursuant to Rule 194 of the Texas Rules of Civil Procedure, Defendants are requested to disclose, within 30 days of service of this request, the information or material described in Texas Rule of Civil Procedure 194.2(a)–(l).

**PRAYER**

WHEREFORE, Ryan respectfully requests that Defendants be cited to appear and on final trial that the Court enter judgment for Ryan for recovery from Defendants for injunctive relief and for Ryan's actual damages, reasonable and necessary attorneys' fees, costs of court, pre- and post-judgment interest at the maximum rate allowed by law, and all such other and further relief, both general and special, at law or in equity, to which Ryan may show itself to be justly entitled.

Respectfully submitted,

JACKSON WALKER LLP

By: */s/ Richard A. Howell*
    Richard A. Howell
    Texas Bar No. 24056674
    G. Scott Fiddler
    Texas Bar No. 06957750
    1401 McKinney Street, Suite 1900
    Houston, Texas 77010
    (713) 752-4531
    (713) 752-4221 (Fax)
    rahowell@jw.com
    sfiddler@jw.com

**ATTORNEYS FOR RYAN, LLC**

2020-35770 / Court: 281

# EXHIBIT A

CAUSE NO. _____

| | | |
|---|---|---|
| RYAN, LLC | § | IN THE DISTRICT COURT OF |
|       Plaintiff, | § | |
| | § | |
| vs. | § | HARRIS COUNTY, TEXAS |
| | § | |
| ERNST & YOUNG, LLP AND | § | |
| S.K. THAKKAR | § | |
|       Defendants. | § | _____ JUDICIAL DISTRICT |

### DECLARATION OF STEVE DUDGEON

1.      "My name is Steve Dudgeon, my date of birth is May 13th, 1985, and my business address is 2800 Post Oak Blvd, Suite 4200, Houston, Texas 77056.

2.      I am a principal in the severance tax and royalty practice of Ryan, LLC, the plaintiff in the above-styled action.

3.      All the facts contained in this Declaration are based on my personal knowledge or my review of documents and information received from Ryan, LLC or its clients, and these facts are true and correct. I have read *Plaintiff's Original Petition and Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction* ("Petition"). The facts stated in paragraphs 5.1 through 5.19, 6.1 through 6.4, 7.3 through 7.5, 8.1 through 8.5 and 9.1 through 9.3 in the Petition are within my personal knowledge and are true and correct.

4.      I reserve the right to correct this declaration if it should appear at any time that omissions or errors have been made, or that additional or more accurate information has been obtained.

5.      I declare under penalty of perjury under the laws of the United States of America and the State of Texas that the foregoing is true and correct."

**Exhibit A**
Page 1 of 2

Executed in Harris County, State of Texas, on the 14th day of June 2020.

_____

Declarant Steve Dudgeon

**Exhibit A**

# Exhibit B-2

7/13/2020 9:57 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 44450959
By: Rhonda Momon
Filed: 7/13/2020 9:57 AM

CAUSE NO. 2020-35770

| | | |
|---|---|---|
| RYAN, LLC | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| ERNST & YOUNG, LLP, | § | |
| S.K. THAKKAR | § | |
| Defendants. | § | 281ST JUDICIAL DISTRICT |
| | § | |

### RYAN, LLC'S FIRST AMENDED VERIFIED PETITION, APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND REQUEST FOR PERMANENT INJUNCTION

Plaintiff Ryan, LLC files this First Amended Verified Petition[1] and shows:

### STATEMENT OF THE CASE

Since at least July 2017, Ernst & Young ("EY") has been engaged in a years-long scheme to steal Ryan LLC's core intellectual property for purposes of building a competing business unit and obtaining other improper economic benefits at Ryan's expense.

Ryan, LLC ("Ryan") is a Texas-based accounting and consulting firm. Ryan has strategically developed its oil and gas severance tax and royalty practice group, and that group serves most of the oil and gas companies in the Fortune 500, helping those companies realize savings and obtain refunds of federal and state taxes and royalties. While federal income tax laws apply uniformly across the country and are widely understood and litigated, severance taxes and federal royalties are not. Through its deliberate focus on and experience in this area, Ryan has developed trade secrets and confidential methodologies to efficiently navigate a patchwork of

---

[1] The facts in this First Amended Petition are verified by the Declaration of Steve Dudgeon, a principal of Ryan. *See* Exhibit "A."

disparate state and federal laws, state and federal regulatory guidance, opinion letters, and state comptroller and auditor positions to achieve significant benefits for clients.

Ernst & Young, LLP ("EY") is a global audit, accounting, and consulting firm with more than 280,000 employees worldwide that provides audit services for public companies.

Ryan has recently learned that EY's audit group has repeatedly demanded Ryan's confidential work papers from clients that include Ryan's trade secrets and are subject to a confidentiality agreement underlying these clients' severance tax and royalty filings. Though discovery, Ryan is now aware of at least 38 instances in which EY's audit group has obtained Ryan's confidential work papers in violation of binding confidentiality agreements from no less than six Ryan clients. Under the guise of "auditing" clients, EY has misappropriated a substantial trove of Ryan intellectual property that EY's audit group then made available to no less than nine separate employees in a new competing federal royalty and severance tax group. No legitimate purpose was served by disseminating Ryan's confidential trade secrets to EY employees who are directly competing with Ryan in the marketplace. Worse, in violation of fundamental accounting rules prohibiting auditors such as EY from using their attest function to profit from consulting services, at least two EY employees, including S.K. Thakkar ("Thakkar"), have used Ryan's work papers to interfere with Ryan's relationships with its clients.

EY's concerted plan to steal Ryan's confidential information has only grown more brazen in recent weeks. In May 2020, EY hired Ryan Nick, a Ryan LLC analyst who had worked in Ryan's federal royalty practice group for the last three years. Because Ryan and EY are direct competitors, Ryan forensically examined information contained on Mr. Nick's computer. This examination revealed that Mr. Nick—contrary to his express assurances to Ryan that he would honor his confidentiality obligations—accessed a substantial volume of confidential Ryan

information immediately prior to his departure on May 6, 2020.  Much of this information was accessed between 4:20 a.m. and 4:41 a.m. on Mr. Nick's last day working for Ryan.  None of the accessed information was relevant to any projects that Mr. Nick had been assigned.  In addition, a review of Mr. Nick's online activity reveals that he also had accessed a number of highly confidential Ryan research projects in the days immediately prior to his departure—research projects that Mr. Nick was not involved with as part of his employment, had no relevance to his work, and that were well outside the scope of his normal employment.  Finally, Mr. Nick's online history also reveals that he repeatedly attempted to access protected drives for other Ryan teams whose work solely concerns state severance tax—an area in which Mr. Nick did not work.

There was no valid business reason for any of Mr. Nick's online activity noted above.  Mr. Nick did not typically work at 4:20 a.m. in the morning, had no connection with the Ryan intellectual property he was reviewing, and would have no reason to examine these files in the hours immediate before he announced his resignation other than to steal Ryan's trade secrets to take with him to EY.

Ryan seeks relief for Defendants' theft and misuse of Ryan's trade secrets, tortious interference with client relationships, and breach of contract.

## 1.

## DISCOVERY CONTROL

1.1.    Ryan intends to conduct discovery in this action under Level 3. TEX. R. CIV. P. 190.4.

## 2.

## RELIEF

2.1.    Ryan seeks injunctive relief and monetary relief valuing more than $1,000,000.00. TEX. R. CIV. P. 47(c)(5).

**3.**

## PARTIES

3.1.     Ryan, LLC is a Delaware limited liability company with its principal place of business at Three Galleria Tower, 13155 Noel Road, Suite 100, Dallas, Texas 75240.

3.2.     Ernst & Young, LLP ("EY") is a Delaware limited liability partnership that is registered to do business in Texas. EY may be served with citation through its registered agent, National Registered Agents, Inc., at 1999 Bryan St., Suite 900, Dallas, Texas 75201. EY has been served through its counsel of record.

3.3.     Saurabh K. Thakkar ("Thakkar") is an individual resident of Fort Bend County, Texas. Thakkar may be served with citation at his home, located at 5335 Fenwick Way Ct., Sugar Land, Texas 77479, or at his EY office, located at 1401 McKinney Street, Suite 2400, Houston, Texas 77010. Thakkar has been served through his counsel of record.

**4.**

## JURISDICTION AND VENUE

4.1.     Subject matter jurisdiction is proper in this Court because Texas district courts are courts of general jurisdiction. TEX. CONST. ART. 5 § 8; TEX. GOV'T CODE §24.007; TEX. GOV'T CODE § 24.011.

4.2.     This Court has general personal jurisdiction over EY because it transacts business in Texas and because Thakkar resides in Texas. Additionally, personal jurisdiction is appropriate because this action arises out of actions of EY and Thakkar that occurred in Harris County, Texas, and the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice.

4.3.     Ryan seeks monetary and non-monetary relief, and the relief sought is within the jurisdictional limits of this Court.

4.4.     Venue is proper in Harris County because this is where a substantial part of the events or omissions giving rise to Ryan claims occurred. TEX. CIV. PRAC. & REM. CODE § 15.002(a)(1).  Further, on information and belief, venue is proper in Harris County because it is the county of EY's principal office in Texas. TEX. CIV. PRAC. & REM. CODE § 15.002(a)(3). Additionally, venue is proper pursuant to Texas Civil Practice and Remedies Code § 15.005.

## 5.

## **FACTUAL BACKGROUND**

5.1.     Ryan is a Texas-based tax services, technology, and consulting firm, and a leading provider of advisory services related to the reduction of oil and gas severance taxes, and taxes or royalties on federal oil, gas, and mineral royalty interests. Through the use of its full suite of proprietary tools and experienced professionals, Ryan's oil and gas severance tax and federal royalty practice represents major oil and gas companies, both Fortune 500 and independent, with services related to reducing oil and gas severance taxes and royalty obligations, navigating complex state and federal audit processes, and consulting on severance tax and royalty issues and tax planning to minimize liability, including preparation of tax returns and preparing refund claims for overpayments.

5.2.     Effective November 30, 2016, Ryan acquired Shiv Om Consultants, LLC ("SOC").

5.3.     Prior to Ryan's acquisition of SOC, Thakkar was employed by SOC as a Project Manager. As a condition to employment with SOC, Thakkar executed an Employment Agreement dated October 15, 2014 wherein Thakkar agreed, among other things, to maintain the confidential information of SOC and its clients, and to not disclose [SOC]'s proprietary information, as well as to not, directly or indirectly, for the purpose of competing, become an employee of or participate in or be connected with any competitive business or entity within a defined geographic area, or solicit any then current clients or employees of SOC for a period of three years following his

termination from SOC. The Employment Agreement inured to the benefit of SOC's successors and assigns. On March 4, 2016, Thakkar signed an amendment to his Employment Agreement, effective January 1, 2016, modifying in part, but reaffirming the remainder of his Employment Agreement, including those restrictive covenants requiring strict confidentiality, noncompetition, and non-solicitation.

5.4.    On November 3, 2016, Thakkar resigned from SOC. Several months after his resignation, Thakkar was hired by EY as a "Senior Manager" in that firm's Federal Royalty and Severance Tax Group.   On information and belief, Thakkar was hired by EY for the express purpose of creating a brand-new business unit that would compete with Ryan in the federal royalty consulting space.

5.5.    Immediately upon learning of this development, Ryan sought written confirmation from EY that Thakkar had "not retained or misused any of [SOC]'s confidential information or proprietary methodologies," nor had he "engaged in the Business" of acting as an adviser and consultant to major integrated oil companies and independents, with services respecting oil and gas severance taxes and royalty obligations in violation of the restrictive covenants in the Employment Agreement and existing obligations SOC. In a response dated September 12, 2017, EY represented that Thakkar was not in breach of any restrictive covenants or continuing obligations in the Employment Agreement.

5.6.    In 2018, still within the term of the restrictive time period, Ryan became concerned that Thakkar was in breach of his confidentiality, noncompetition, and non-solicitation restrictions of his Employment Agreement. Ryan initiated proceedings against Thakkar in Fort Bend County District Court in *In re Ryan, LLC* with Cause No. 19-CV-259671. To resolve that dispute, both EY, through its Associate General Counsel Peter J. Cahill and Thakkar represented by letter, dated

April 26, 2019, that Thakkar had complied and would continue to comply with the restrictive covenants of his Employment Agreement with SOC and had not misused "confidential information and proprietary methodologies" belonging to Ryan, as successor in interest to SOC.   On information and belief, these representations were false.   As a result of the civil action filed against Thakkar, EY has been on notice since *at least* February 2019 that *all* of Ryan's work papers are subject to binding and enforceable confidentiality agreements with Ryan's own clients.

5.7.    In November 2019, Ryan learned that Thakkar had begun pitching EY's federal royalty services to Ryan's own clients.   During these solicitations, Thakkar indicated that he had firsthand knowledge of Ryan's confidential federal royalty work papers and that the client would be disappointed by Ryan's deliverables.   Because Thakkar had never been employed by Ryan in its federal royalty practice, his firsthand knowledge could not have come from Ryan. Rather, Ryan subsequently discovered that EY's audit group had demanded Ryan's work papers from its severance tax and federal royalty clients (in breach of Ryan's confidentiality agreements) under the guise of "auditing," only to then provide Ryan's confidential intellectual property to Thakkar. Despite having audited several of Ryan's energy clients for years, this was the first time to Ryan's knowledge that EY auditors had ever requested Ryan's confidential work papers in connection with routine audits.   That timing was not an innocent coincidence.

5.8.    Ryan's severance tax and federal royalty group has dedicated years to the development of confidential, proprietary, and trade secret models and methodologies derived from expert skills and experience, including countless interactions with state and federal tax and royalty authorities, extensive research, and mutually agreed upon guidance documents developed in collaboration with the U.S. Department of the Interior. Ryan combines its models and methodologies with detailed data analysis to maximize recovery for or limit liability of its clients.

The information contained in Ryan's work product is not commonly known, ascertainable by the general public, or readily comprehensible without the benefit of experience, both in time and money expended, and the context of the information aggregated and organized from research conducted by Ryan's employees that has provided a substantial competitive advantage for Ryan in the marketplace.

5.9.    To protect that effort, Ryan insists upon a confidentiality agreement with each client it engages, substantially similar to the following:

> Ryan's work product, including specific engagement procedures and techniques, constitutes proprietary and exclusive information, and Client further agrees not to disclose such information to any third party without obtaining prior written approval from Ryan. Further, Ryan's tax saving strategies constitute proprietary and exclusive information.

After confidentiality is ensured, Ryan and its clients work closely together, exchanging confidential and proprietary work product such as accounting work papers, schedules, and spreadsheets that Ryan and its clients maintain and protect. Ryan's clients are obligated to maintain the secrecy of Ryan's trade secret work product.   Ryan has never provided a written waiver authorizing EY to freely use and transmit Ryan's confidential intellectual property for any purpose—audit or otherwise.

5.10.   Ryan also requires that its employees execute confidentiality agreements or imposes restrictive covenants in employment agreements that preclude employees from soliciting business from Ryan clients for a defined period following separation from Ryan.

5.11.   Ryan's work product is intended to remain confidential and, per the engagement agreements with Ryan's clients, should not be shared with EY unless expressly permitted to do so by Ryan – a fact that has been acknowledged by EY to other Ryan clients. Similarly, and as an auditor to Ryan's clients, EY is prohibited from sharing confidential information with non-audit EY employees outside of the attest function to verify and report that certain tax treatments

accurately reflected the clients' accounting.  Likewise, under Texas law, EY must abide by the Uniform Accountancy Act, which expressly provides that it is unlawful for an accountant to offer or recommend that the client also pay for other services, such as federal royalty services, whether for commission or contingency fee, when that accountant also provides audit services to the client. Accordingly, EY was on notice that: (1) its audit teams should not share confidential information with non-attest members; and (2) based on Texas law, EY should not perform nor offer severance tax or federal royalty services for any audit client.

5.12.   Under Texas law, there is no legitimate use of stolen intellectual property.  Yet, despite being on notice that Ryan's information was protected information and that EY should not use its position as auditor to solicit non-audit work, EY's audit team accessed and acquired Ryan's confidential work product without Ryan's knowledge or consent from multiple mutual clients. To obtain the work product, EY's team requested Ryan's confidential work product from a mutual client under the guise of the documents being necessary for the team to complete the audited financials for the client. EY did this despite knowing that Ryan's work papers were subject to binding confidentiality agreements.  Because Ryan's client feared that EY would refuse to produce audited financials unless the documents were turned over, it acquiesced.  Upon information and belief, the audit team then forwarded the documents to Thakkar, who posed as a federal royalty "specialist" for the purposes of deciphering Ryan's work product. EY has never requested Ryan's work product in the past and has certified these audits without qualification.

5.13.   On information and belief, Thakkar and EY have attempted to reverse-engineer the unlawfully obtained Ryan work papers for the purposes of developing EY's fledgling federal oil and gas royalty offerings. To Ryan's knowledge, EY did not market nor offer federal oil and gas royalty services prior to Thakkar obtaining, disseminating, and utilizing Ryan's work product,

which, along with historical engagements in the industry, indicate EY does not possess the knowledge, skills, or expertise to compete with Ryan in providing federal royalty services. Thakkar's use of EY's audit services to obtain Ryan's trade secret information and market EY's severance tax and royalty services is unlawful, a breach of Thakkar's continuing obligations under the Employment Agreement, and EY is liable for Thakkar's ongoing unlawful conduct.

5.14.   Thakkar has brazenly proceeded in the marketing of Ryan's confidential, proprietary, and trade-secret information as EY's own. Thakkar has approached mutual clients, indicating he has seen "Ryan's work" and offered to perform federal royalty services on an hourly basis. Further, on information received by Ryan, Thakkar has attempted to undermine Ryan's existing contracts with its clients by citing his review of Ryan work papers, and then defaming Ryan as doing "bad work" and alleging Ryan "hides" solutions. This is all based on Thakkar's illegal acquisition and use of Ryan's work product and is false.

5.15.   Of additional concern is Thakkar's and EY's ongoing and continued demands for Ryan clients to provide Ryan's confidential, proprietary, and trade-secret work product to EY's audit teams. By way of example, a Ryan client that acceded to EY's demand and provided EY with Ryan's confidential, proprietary, and trade-secret work product has continually been harassed by similar demands from EY's audit team and rudimentary questions relating to the client's federal royalty schedules. This unlawful behavior continues despite at least one EY audit partner acknowledging the actions and assuring that EY would address the problem internally.

5.16.   Further underscoring the illegitimate and illegal nature of the audit team's requests, another mutual client approached by EY refused to provide the requested Ryan information, citing the confidentiality obligations and the lack of any legitimate and lawful purpose in EY's requests. After this client that refused EY's requests, EY has issued audited financials without qualification.

This inconsistency between similarly situated attest EY clients proves that EY's requests for Ryan's work papers serve no legitimate audit purpose.

5.17.    EY has further misappropriated Ryan's intellectual property by exploiting it for EY's own benefit in conducting audits of EY clients.  By using Ryan's work as shortcut, EY has enjoyed substantial (and improper) economic benefit by substituting Ryan's work product for the hundreds of man-hours that would otherwise be required to certify the federal royalty entries and credits on EY client's financial statements. Accordingly, EY, Nick, and Thakkar have misappropriated Ryan trade secret information, done so in an unlawful manner, knowingly and with intent to harm Ryan. But EY's scheme of stealing Ryan's trade secrets does not stop there.

5.18.    Ryan Nick worked in Ryan's severance tax and federal royalty group and worked on certain federal royalty projects at Ryan. Notably, Ryan did not work on and has no expertise or experience in severance tax.

5.19.    On May 6, 2020, out of the blue, Nick announced that he was leaving Ryan to join EY's severance tax and royalty division. Ryan employees questioned Nick and asked for his assurances that he understood and would honor his confidentiality obligations to Ryan. Nick assured Ryan that he has and would honor these obligations. This was a lie.

5.20.    Given its grave concerns about EY's behavior, Ryan forensically examined Nick's Ryan-issued laptop. This examination revealed that Nick—contrary to his express assurances to Ryan that he would honor his confidentiality obligations—accessed a substantial volume of confidential, proprietary, and trade-secret work product immediately prior to his departure on May 6, 2020. Much of this information was accessed between 4:20 a.m. and 4:41 a.m. on May 6, 2020— mere hours before he announced he was leaving Ryan to join EY. Nick did not normally work at this hour. None of the information Nick accessed was relevant to any projects that Nick had been

assigned. In addition, a review of Nick's online activity reveals that he accessed a number of highly confidential Ryan research projects in the days immediately prior to his departure—research projects that Nick was not involved with as part of his employment, had no relevance to his work, and that were well outside the scope of his normal employment.  Finally, Nick's online history also reveals that he repeatedly attempted to access protected drives for other Ryan teams whose work solely concerns state severance tax—an area that Nick did not work in.  There was no valid business reason for any of Nick's online activity noted above.

**6.**

## COUNT I: MISAPPROPRIATION OF TRADE SECRETS

6.1.    Ryan incorporates the preceding paragraphs as if fully stated herein.

6.2.    Thakkar and Nick on behalf of EY, as early as Thakkar's first day at EY, illegally acquired and are using Ryan's confidential, proprietary, and trade secret information to improperly compete against Ryan in violation of the Texas Uniform Trade Secret Act ("TUTSA"). Ryan's confidential and proprietary methodologies derive substantial, independent economic value from not being generally known to the public or to its competitors, who could obtain economic value from this information. Ryan expended significant financial and human resources to obtain and develop this information, which cannot be easily acquired or replicated by others. Moreover, Ryan has taken substantial efforts to maintain the secrecy of this information, including, but not limited to, restricting access to such information, designating such information as confidential, and requiring confidentiality agreements. As such, Ryan's confidential and proprietary information constitutes trade secrets pursuant to TUTSA and common law.

6.3.    As early as July 1, 2017, Thakkar and EY misappropriated Ryan's trade secret information and knew or had reason to know the use or disclosure of the trade secret information was unlawful and in violation of Thakkar's Employment Agreement.  EY has continued to

-12-

improperly exploit Ryan's confidential intellectual property in conducting audits, soliciting Ryan clients, and creating a competing federal royalty practice group whose know-how and methodologies have been stolen from trade secrets that Ryan spent more than a decade developing.

6.4.    Ryan was injured and continues to be injured as a direct result of Thakkar's and EY's ongoing conduct and therefore seeks actual damages (including, but not limited to, lost profits), fee forfeiture and disgorgement, a constructive trust (and other equitable remedies).

6.5.    Thakkar's and EY's misappropriation of trade secrets was willful and malicious and thus justifies an award of exemplary damages, which Ryan also seeks.

## 7.

### COUNT II: TORTIOUS INTERFERENCE WITH CONTRACT

7.1.    Ryan incorporates the preceding paragraphs as if fully stated herein.

7.2.    EY is liable to Ryan for tortiously interfering with Ryan's present and prospective business relationships with Ryan clients.

7.3.    Ryan's agreements with its clients are valid and enforceable contracts.

7.4.    EY's tortious interference was and continues to be a proximate cause of damages to Ryan, which continues to accrue and cause irreparable harm to Ryan.

7.5.    EY's and Thakkar's conduct was malicious and carried out with such intent that it justifies the imposition of punitive damages against EY sufficient to punish and deter EY from similar conduct in the future.

## 8.

### COUNT III: BREACH OF CONTRACT

8.1.    Ryan incorporates the preceding paragraphs as if fully stated herein.

8.2.    The Employment Agreement constitutes a valid and binding contract, which obligated Thakkar to not disclose confidential information received in the course of his

employment. Thakkar's obligations under the Employment Agreement to not disclose confidential information did not terminate on his resignation, nor on the expiration of his non-compete term.

8.3.    Ryan as successor to SOC possesses the right to enforce the Employment Agreement.

8.4.    Thakkar has materially breached the Employment Agreement by disclosing Ryan's confidential information.

8.5.    Thakkar's breach of the Employment Agreement caused injury to Ryan.

8.6.    As a direct result of Thakkar's breach of the Employment Agreement, Ryan seeks damages to be proven in excess of $1,000,000.

**9.**

## APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

9.1.    Due to Defendants' conduct set out above, Ryan is threatened with imminent harm and irreparable injury. Ryan is threatened with imminent harm because Defendants abused its audit relationships to: a) misappropriate customer relationships belonging to Ryan; b) misappropriate confidential information and trade secrets belonging to Ryan related to Ryan's provision of severance tax and federal oil and gas royalty services, customer relationships, and other matters; and c) usurp business opportunities belonging to Ryan. This wrongful conduct has already harmed Ryan considerably. Given the events already past, and the course of conduct currently unfolding, this harm is likely to greatly increase in the immediate future if Defendants are not enjoined as requested herein. Among other things, Ryan has and will likely continue to lose confidential and proprietary processes, methodologies, information and trade secrets, in addition to loss of business and suffer a loss of goodwill and customer relationships

9.2.    Ryan is also threatened with irreparable injury. As set forth above, if Defendants are not enjoined as requested herein, Ryan's confidential and proprietary processes and methodologies and trade secrets will be learned and deployed by a competitor, causing a loss of goodwill and untold future customers. Additionally, confidential information belonging to Ryan is likely to be used to unlawfully compete with Ryan. These circumstances give Defendants an unfair advantage over Ryan in the marketplace, which have and will continue to harm Ryan's relationships with customers. The full economic damage caused by this activity will be difficult or impossible to fully calculate.

9.3.    If Defendants are not enjoined as requested herein, Ryan will have no adequate remedy at law. Even if monetary damages are awarded, they will not undo the damage and ongoing harm caused by Defendants continuing to use Ryan's confidential and proprietary knowledge, methodologies, and trade secrets to unlawfully disrupt Ryan's business. Also, as noted above, the economic harm Ryan will suffer will be difficult or impossible to fully calculate. Additionally, Defendant Thakkar is unlikely to be able to pay a judgment for damages for the harm Ryan is likely to suffer. Consequently, the potential recovery of a monetary judgment after trial will not make Ryan whole and will not be an adequate remedy at law.

9.4.    As an additional ground for injunctive relief, section 65.011 of the Texas Civil Practice and Remedies Code provides that injunctive relief may be granted if: 1) the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant; or 2) a party performs or is about to perform or is procuring or allowing the performance of an act relating to the subject of pending litigation, in violation of the rights of the applicant, and the act would tend to render the judgment in that litigation ineffectual. TEX. CIV.

PRAC. & REM. CODE § 65.011. Based on the facts alleged above, injunctive relief is warranted under either or both of those provisions.

9.5.    On June 19, 2020, the Court entered into a temporary restraining order and extended it on July 2, 2020. On July 10, 2020, the Court modified the temporary restraining order.  Ryan requests that the existing temporary restraining order remain in place.

9.6.    Based on the foregoing, Ryan requests that the Court enter a temporary injunction, prohibiting Defendants from, directly or indirectly, alone or in conjunction with others, between the present time and the date of the final trial in this matter:

   a.    Retaining, using, or disclosing any of Ryan's confidential and/or proprietary information obtained from Ryan and Ryan's customers, including, but not limited to, Ryan's work papers reflecting Ryan's severance tax work and calculations and Ryan's federal oil and gas royalties work and calculations. Defendants must return to Ryan or Ryan's customers all of Ryan's confidential information and work papers relating reflecting Ryan's severance tax work and calculations and Ryan's federal oil and gas royalties work and calculations;

   b.    seeking any Ryan work papers, or any other confidential and proprietary Ryan information from Ryan's customers for purposes of conducting an audit or providing severance tax or federal oil and gas royalties services; and

   c.    seeking any Ryan work papers or any other confidential and proprietary Ryan information from current or former Ryan employees without the express written consent of Ryan.

9.7.    Ryan requests that these injunctions be binding upon the named enjoined persons, and to their officers, agents, representatives, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual or constructive notice of the injunction by personal service or otherwise.

9.8.    Ryan is willing to post a bond in a just and reasonable amount set by the Court.

-16-

## 10.

## **PERMANENT INJUNCTION**

10.1.   Ryan also seeks a permanent injunction prohibiting Defendants from directly or indirectly, alone or in conjunction with others, from the date of the permanent injunction order:

a.  Retaining, using, or disclosing any of Ryan's confidential and/or proprietary information obtained from Ryan and Ryan's customers, including, but not limited to, Ryan's work papers reflecting Ryan's severance tax work and calculations and Ryan's federal oil and gas royalties work and calculations. Defendants must return to Ryan or Ryan's customers all of Ryan's confidential information and work papers relating reflecting Ryan's severance tax work and calculations and Ryan's federal oil and gas royalties work and calculations;

b.  seeking any Ryan work papers, or any other confidential and proprietary Ryan information from Ryan's customers for purposes of conducting an audit or providing severance tax or federal oil and gas royalties services; and

c.  seeking any Ryan work papers or any other confidential and proprietary Ryan information from current or former Ryan employees without the express written consent of Ryan.

Ryan further requests that the Court enter a permanent injunction ordering Defendants to do the following from the date of the permanent injunction order:

d.  certifying on a quarterly basis to Ryan that it has complied with the Permanent Injunction Order for a period of 10 years.

## 11.

## **ATTORNEYS' FEES**

11.1.   Ryan incorporates the preceding paragraphs as if fully stated herein.

11.2.   Pursuant to Texas Civil Practice and Remedies Code §§ 38.0001, 134A.003 – .005, Ryan is entitled to recover its reasonable attorneys' fees and expenses incurred in prosecuting its claims against EY and Thakkar.

11.3.   Ryan has performed the conditions precedent necessary for the recovery of attorneys' fees from EY and Thakkar.

## 12.

## RESPONDEAT SUPERIOR

12.1.    Ryan incorporates the preceding paragraphs as if fully stated herein.

12.2.    All of Thakkar's and Nick's conduct alleged herein has occurred in the course and scope of his employment with EY, and EY had knowledge and supported all conduct alleged herein.

## 13.

## CONDITIONS PRECEDENT

13.1.    All conditions precedent to Ryan's right to recover on the claims and recover attorneys' fees stated herein were met, otherwise occurred, or were waived.

## 14.

## RESERVATION OF RIGHTS

14.1.    Ryan reserves its rights under Texas law to assert additional claims and remedies, including temporary or permanent injunctive relief.

## 15.

## REQUEST FOR EXPEDITED DISCOVERY

15.1.    To prepare for the temporary injunction hearing in this action and based on Defendants' actions and need to protect Ryan's trade secrets and confidential information, Ryan seeks limited, expedited discovery. This Court has discretion to schedule discovery and may shorten or lengthen the time for making a response for good cause. *In re Colonial Pipeline Co.*, 968 S.W.2d 938, 943 (Tex. 1998) (orig. proceeding). The appropriate standard for expedited discovery is reasonableness or good cause. *See id*. at 941. Expedited discovery is appropriate when, as here, an application for preliminary injunction is pending. *See In re Nat'l Lloyds Ins. Co.*, 13-15-00390-CV, 2015 WL 6759153, at *4 (Tex. App.—Corpus Christi Nov. 3, 2015, no pet.)

-18-

("Parties frequently seek, and trial courts order, expedited discovery in the course of proceedings pertaining to temporary restraining orders.").

15.2.    Ryan requests expedited discovery to prepare for the temporary injunction hearing. First, Ryan asks the Court to order the Defendants to respond to the document requests attached as Exhibit "B" within five days of service. These document requests are limited in number, time, and scope to issues concerning Ryan's Application for Temporary Injunction. Second, Ryan requests that it be permitted to take the deposition of Thakkar and an EY corporate representative for up to two hours per deposition, without prejudice to utilizing the remaining time available for each under the Texas Rules of Civil Procedure at a later date.

## 16.

## REQUEST FOR DISCLOSURE

16.1.    Pursuant to Rule 194 of the Texas Rules of Civil Procedure, Defendants are requested to disclose, within 30 days of service of the Original Petition, the information or material described in Texas Rule of Civil Procedure 194.2(a)–(l).

## 17.

## JURY DEMAND

17.1    Ryan demands a jury trial and tenders the appropriate fee with this Petition.

## PRAYER

WHEREFORE, Ryan respectfully requests that Defendants be cited to appear and on final trial that the Court enter judgment for Ryan for recovery from Defendants for injunctive relief and for Ryan's actual damages, reasonable and necessary attorneys' fees, costs of court, pre- and post-judgment interest at the maximum rate allowed by law, and all such other and further relief, both general and special, at law or in equity, to which Ryan may show itself to be justly entitled.

Dated: July 13, 2020    Respectfully submitted,


       **AHMAD, ZAVITSANOS, ANAIPAKOS,
        ALAVI & MENSING, PC**

       */s/ Todd Mensing*
       Todd Mensing
       Texas Bar No. 24013156
       tmensing@azalaw.com
       Foster Johnson
       Texas Bar No. 24076463
       fjohnson@azalaw.com
       Monica Uddin
       Texas Bar No. 24075195
       muddin@azalaw.com
       Paul Turkevich
       Texas Bar. No. 24102585
       pturkevich@azalaw.com
       1221 McKinney, Suite 2500
       Houston, Texas 77010
       (713) 655-1101 – Phone
       (713) 655-0062 – Fax

       **ATTORNEYS FOR RYAN, LLC**

**EXHIBIT A**

CAUSE NO. 2020-35770

| | | |
|---|---|---|
| RYAN, LLC | § | IN THE DISTRICT COURT OF |
|     *Plaintiff,* | § | |
| | § | |
|     v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| ERNST & YOUNG, LLP AND | § | |
| S.K. THAKKAR | § | |
|     *Defendants.* | § | 281ST JUDICIAL DISTRICT |

## DECLARATION OF STEVE DUDGEON

1.  My name is Steve Dudgeon, my date of birth is May 13, 1985. My business address is 2800 Post Oak Blvd, Suite 4200 Houston, Texas 77056. I am over the age of twenty-one (21) and of sound mind. I have never been convicted of a felony or crime of moral turpitude. I am competent to make this declaration.

2.  I am a Principal in the Severance Tax and Royalty Group at Ryan, LLC ("Ryan"). I have been working in the group for more than 10 years. Through my work as a Principal at Ryan, I have developed personal knowledge of the facts contained in this Declaration, including through conversations with Ryan employees and clients, and a review of documents and SEC public filings. The facts in this Declaration are true and correct.

3.  All facts contained in this Declaration are based on my personal knowledge or my review of documents and information received from Ryan, LLC or its clients, and these facts are true and correct to the best of my knowledge. I have read *Plaintiff's Amended Petition and Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction* ("Petition"). The facts stated in paragraphs 5.1 through 5.20, 6.1 through 6.5, 7.2 through 7.5, 8.2 through 8.6, 9.1 through 9.8, 10.1., and 12.1 are within my personal knowledge and are true and correct.

-21-

**Exhibit**

**A**

4.     I declare under penalty of perjury under the laws of the United States of America and the State of Texas that the foregoing is true and correct.

Executed in Harris County, Texas on 12th day of July 2020.

_____

Declarant Steve Dudgeon

Exhibit B-3

8/3/2020 8:58 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 45026595
By: Bonnie Lugo
Filed: 8/3/2020 8:58 AM

**Cause No. 2020-35770**

| | | |
|---|---|---|
| RYAN, LLC | § | IN THE DISTRICT COURT OF |
|     Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| ERNST & YOUNG, LLP AND | § | |
| S.K. THAKKAR | § | |
|     Defendants. | § | 281ST JUDICIAL DISTRICT |

## ERNST & YOUNG, LLP AND S.K. THAKKAR'S ORIGINAL ANSWER

Ernst & Young, LLP and S.K. Thakkar ("Defendants") file this Original Answer to Plaintiff's First Amended Verified Petition, Application for Temporary Restraining Order, Temporary Injunction, and Request for Permanent Injunction.

### General Denial

Pursuant to Texas Rule of Civil Procedure 92, Defendants generally deny all of the allegations in Plaintiff's First Amended Verified Petition, Application for Temporary Restraining Order, Temporary Injunction, and Request for Permanent Injunction.

### Defenses, Including Affirmative Defenses

1. Plaintiff's claims are barred, in whole or in part, because Plaintiff's allegations are impermissibly vague and indefinite, fail to give fair and adequate notice of Defendants' supposed wrongdoing, and fail to state a claim upon which relief can be granted.

2. Plaintiff's claims are barred, in whole or in part, to the extent that Plaintiff seeks redress for harms that accrued prior to the applicable statute of limitations.

3. Plaintiff's claims are barred, in whole or in part, by laches, equitable estoppel, waiver, unclean hands, and other related equitable doctrines.

4. Plaintiff's claims are barred, in whole or in part, by justification and privilege.

5. Plaintiff's claims are barred, in whole or in part, because the information at issue

does not constitute trade secrets, property, or proprietary information belonging to Plaintiff and protected under Texas law, including but not limited to Chapter 134A of the Texas Civil Practice and Remedies Code.

6. Plaintiff's claims are barred, in whole or in part, under Chapter 134A of the Texas Civil Practice and Remedies Code because the alleged trade secret information was acquired by proper means and/or with authorization from the true owner of the information.

7. Plaintiff's recovery is barred, in whole or in part, under the proportionate-responsibility rules set forth in Chapter 33 of the Texas Civil Practice and Remedies Code because Plaintiff or third parties are responsible for Plaintiff's alleged injuries.

8. Plaintiff's recovery is barred, in whole or in part, due to its failure to mitigate damages.

9. Plaintiff's request for exemplary damages must be limited by Chapter 41 of the Texas Civil Practice and Remedies Code.

10. Plaintiff's claims for injunctive relief are barred, in whole or in part, because Chapter 134A of the Texas Civil Practice and Remedies Code disallows enjoining a person from using general knowledge, skill, and experience that person acquired during his employment.

11. Plaintiff's claims for injunctive relief are barred, in whole or in part, because all of the common law elements to obtain such extraordinary relief are absent given that: (a) Defendants have not committed any act giving rise to a remedy in equity; (b) there is no imminent harm that is amenable to injunctive relief; (c) Plaintiff has not suffered, and will not suffer, irreparable injury as a result of any wrongful act; and (d) in any event, Plaintiff has an adequate remedy at law.

12. Plaintiff's claims for injunctive relief are barred, in whole or in part, under Texas Civil Practice and Remedies Code § 65.011(2) because Defendants are not performing, about to

perform, procuring, or allowing the performance of any act relating to the subject of this litigation, in violation of the rights of Plaintiff, that would tend to render judgment in this litigation ineffectual.

Defendants reserve the right to raise at a later time any additional defenses, counterclaims, cross-claims, and third-party claims not asserted herein of which they may become aware through discovery or other investigation.

## Request for Disclosure

Under Texas Rule of Civil Procedure 194, defendant requests that plaintiff disclose, within 30 days of the service of this request, the information or material described in Rule 194.2.

## Relief Requested

Ernst & Young, LLP and S.K. Thakkar respectfully request that Plaintiff takes nothing by reason of this suit, that they recover their costs of court, expenses, and attorney's fees, and that they be awarded all other relief to which they are entitled.

Date: August 3, 2020

Respectfully Submitted,

BAKER BOTTS L.L.P.

*/s/  Jessica B. Pulliam*
Jessica B. Pulliam
State Bar Number 24037309
jessica.pulliam@bakerbotts.com
Christopher W. Hunt
State Bar Number 24101944
chris.hunt@bakerbotts.com
2001 Ross Ave, Suite 900
Dallas, Texas 75201
(214) 953-6500 (telephone)
(214) 953-6503 (facsimile)

-and-

Louis E. Layrisson, III
State Bar No. 24067722
louie.layrisson@bakerbotts.com
910 Louisiana Street
Houston, Texas 77002
Tel.: (713) 229-1234
Fax: (713) 229-1522

***ATTORNEYS FOR
DEFENDANTS
ERNST & YOUNG, LLP AND
S.K. THAKKAR***

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2020, a copy of this brief was served in accordance with

the Texas Rules of Civil Procedure.

*/s/  Jessica B. Pulliam*
Jessica B. Pulliam

Exhibit B-4

8/19/2020 5:11 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 45533963
By: Bonnie Lugo
Filed: 8/19/2020 5:11 PM

CAUSE NO. 2020-35770

| | | |
|---|---|---|
| RYAN, LLC | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| ERNST & YOUNG, LLP, | § | |
| S.K. THAKKAR | § | |
| Defendants. | § | 281ST JUDICIAL DISTRICT |
| | § | |

---

## PLAINTIFF'S SECOND AMENDED PETITION

---

Plaintiff Ryan, LLC files this Second Amended Petition against Defendants and alleges as follows:

## **INTRODUCTION**

Since at least July 2017, Ernst & Young ("EY") has been engaged in a years-long scheme to steal Ryan LLC's core intellectual property for purposes of building a competing business unit and obtaining other improper economic benefits at Ryan's expense.

Ryan, LLC ("Ryan") is a Texas-based accounting and consulting firm. Ryan has strategically developed its oil and gas severance tax and royalty practice group, and that group serves most of the oil and gas companies in the Fortune 500, helping those companies realize savings and obtain refunds of state taxes and federal royalties. While federal income tax laws apply uniformly across the country and are widely understood and litigated, severance taxes and federal royalties are not. Through its deliberate focus on and experience in this area, Ryan has developed trade secrets and confidential methodologies to efficiently navigate a patchwork of disparate state and federal laws, state and federal regulatory guidance, opinion letters, and state comptroller and auditor positions to achieve significant benefits for clients.

Ernst & Young, LLP ("EY") is a global audit, accounting, and consulting firm with more than 280,000 employees worldwide that provides audit services for public companies.

Ryan has recently learned that EY's audit group has repeatedly demanded Ryan's confidential work papers from clients that include Ryan's trade secrets and are subject to a confidentiality agreement underlying these clients' severance tax and royalty filings. Though discovery, Ryan is now aware of at least 38 instances in which EY's audit group has obtained Ryan's confidential work papers in violation of binding confidentiality agreements from no less than six Ryan clients. Under the guise of "auditing" clients, EY has misappropriated a substantial trove of Ryan intellectual property that EY's audit group then made available to no less than nine separate employees in a new competing federal royalty and severance tax group. No legitimate purpose was served by disseminating Ryan's confidential trade secrets to EY employees who are directly competing with Ryan in the marketplace. Worse, in violation of fundamental accounting rules prohibiting auditors such as EY from using their attest function to profit from consulting services, at least two EY employees, including S.K. Thakkar ("Thakkar"), have used Ryan's work papers to interfere with Ryan's relationships with its existing clients and compete for business with new clients.

EY's concerted plan to steal Ryan's confidential information has only grown more brazen in recent weeks. In May 2020, EY hired Ryan Nick, a Ryan LLC senior consultant who had worked in Ryan's federal royalty practice group for the last three years. Because Ryan and EY are direct competitors, Ryan forensically examined information contained on Mr. Nick's computer. This examination revealed that Mr. Nick—contrary to his express assurances to Ryan that he would honor his confidentiality obligations—accessed a substantial volume of confidential Ryan information immediately prior to his departure on May 6, 2020. Much of this information

was accessed between 4:20 a.m. and 4:41 a.m. on Mr. Nick's last day working for Ryan.  None of

the accessed information was relevant to any projects that Mr. Nick had been assigned.  In addition,

a review of Mr. Nick's online activity reveals that he also had accessed a number of highly

confidential Ryan research projects in the days immediately prior to his departure—research

projects that Mr. Nick was not involved with as part of his employment, had no relevance to his

work, and that were well outside the scope of his normal employment.  Finally, Mr. Nick's online

history also reveals that he repeatedly attempted to access protected drives for other Ryan teams

whose work solely concerns state severance tax—an area in which Mr. Nick did not work.

There was no valid business reason for any of Mr. Nick's online activity noted above.  Mr.

Nick did not typically work at 4:20 a.m. in the morning, had no connection with the Ryan

intellectual property he was reviewing, and would have no reason to examine these files in the

hours immediate before he announced his resignation other than to steal Ryan's trade secrets to

take with him to EY.

Ryan seeks relief for Defendants' theft and misuse of Ryan's trade secrets, tortious

interference with current and prospective client and relationships, and breach of contract.

## 1.

## DISCOVERY CONTROL

1.1.    Ryan intends to conduct discovery in this action under Level 3. TEX. R. CIV. P.

190.4.

## 2.

## RELIEF

2.1.    Ryan seeks injunctive relief and monetary relief valuing more than $1,000,000.00.

TEX. R. CIV. P. 47(c)(5).

**3.**

**PARTIES**

3.1.     Ryan, LLC is a Delaware limited liability company with its principal place of business at Three Galleria Tower, 13155 Noel Road, Suite 100, Dallas, Texas 75240.

3.2.     Ernst & Young, LLP ("EY") is a Delaware limited liability partnership that is registered to do business in Texas. EY may be served with citation through its registered agent, National Registered Agents, Inc., at 1999 Bryan St., Suite 900, Dallas, Texas 75201. EY has been served through its counsel of record.

3.3.     Saurabh K. Thakkar ("Thakkar") is an individual resident of Fort Bend County, Texas. Thakkar may be served with citation at his home, located at 5335 Fenwick Way Ct., Sugar Land, Texas 77479, or at his EY office, located at 1401 McKinney Street, Suite 2400, Houston, Texas 77010. Thakkar has been served through his counsel of record.

**4.**

**JURISDICTION AND VENUE**

4.1.     Subject matter jurisdiction is proper in this Court because Texas district courts are courts of general jurisdiction. TEX. CONST. ART. 5 § 8; TEX. GOV'T CODE §24.007; TEX. GOV'T CODE § 24.011.

4.2.     This Court has general personal jurisdiction over EY because it transacts business in Texas and because Thakkar resides in Texas. Additionally, personal jurisdiction is appropriate because this action arises out of actions of EY and Thakkar that occurred in Harris County, Texas, and the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice.

4.3.     Ryan seeks monetary and non-monetary relief, and the relief sought is within the jurisdictional limits of this Court.

4.4.    Venue is proper in Harris County because this is where a substantial part of the events or omissions giving rise to Ryan claims occurred. TEX. CIV. PRAC. & REM. CODE § 15.002(a)(1).  Further, on information and belief, venue is proper in Harris County because it is the county of EY's principal office in Texas. TEX. CIV. PRAC. & REM. CODE § 15.002(a)(3). Additionally, venue is proper pursuant to Texas Civil Practice and Remedies Code § 15.005.

**5.**

## FACTUAL BACKGROUND

5.1.    Ryan is a Texas-based tax services, technology, and consulting firm, and a leading provider of advisory services related to the reduction of oil and gas severance taxes, and taxes or royalties on federal oil, gas, and mineral royalty interests. Through the use of its full suite of proprietary tools and experienced professionals, Ryan's oil and gas severance tax, sales and use tax, and federal royalty practice represents major oil and gas companies, both Fortune 500 and independent, with services related to reducing oil and gas severance taxes and royalty obligations, navigating complex state and federal audit processes, and consulting on severance tax and royalty issues and tax planning to minimize liability, including preparation of tax returns and preparing refund claims for overpayments.

5.2.    Effective November 30, 2016, Ryan acquired Shiv Om Consultants, LLC ("SOC").

5.3.    Prior to Ryan's acquisition of SOC, Thakkar was employed by SOC as a Project Manager. As a condition to employment with SOC, Thakkar executed an Employment Agreement dated October 15, 2014 wherein Thakkar agreed, among other things, to maintain the confidential information of SOC and its clients, and to not disclose SOC'S proprietary information.  Thakkar further agreed to refrain, for the purpose of competing, from becoming an employee of or participate in or be connected with any competitive business or entity within a defined geographic area, or solicit any then current clients or employees of SOC for a period of three years following

his termination from SOC. The Employment Agreement inured to the benefit of SOC's successors and assigns. On March 4, 2016, Thakkar signed an amendment to his Employment Agreement, effective January 1, 2016, modifying in part, but reaffirming the remainder of his Employment Agreement, including those restrictive covenants requiring strict confidentiality, noncompetition, and non-solicitation.

5.4.    On November 3, 2016, Thakkar resigned from SOC. Several months after his resignation, Thakkar was hired by EY as a "Senior Manager" in that firm's Indirect Tax Group. On information and belief, Thakkar was hired by EY for the express purpose of creating a brand-new business unit that would compete with Ryan in the federal royalty, severance tax, and sales and use tax consulting space.

5.5.    Immediately upon learning of this development, Ryan sought written confirmation from EY that Thakkar had "not retained or misused any of [SOC]'s confidential information or proprietary methodologies," nor "engaged in the Business" of acting as an adviser and consultant to major integrated oil companies and independents, with services respecting oil and gas severance taxes and royalty obligations in violation of the restrictive covenants in the Employment Agreement and existing obligations SOC. In a response dated September 12, 2017, EY represented that Thakkar was not in breach of any restrictive covenants or continuing obligations in his Employment Agreement.

5.6.    In 2018, still within the term of the restrictive time period, Ryan became concerned that Thakkar was in breach of his confidentiality, noncompetition, and non-solicitation restrictions of his Employment Agreement. Ryan initiated proceedings against Thakkar in Fort Bend County District Court in *In re Ryan, LLC* with Cause No. 19-CV-259671. To resolve that dispute, both EY, through its Associate General Counsel Peter J. Cahill and Thakkar represented by letter, dated

April 26, 2019, that Thakkar had complied with and would continue to comply with the restrictive covenants of his Employment Agreement with SOC and had not misused "confidential information and proprietary methodologies" belonging to Ryan, as successor in interest to SOC. These representations were false. On information and belief, Thakkar had solicited current Ryan severance tax clients.  As a result of the civil action filed against Thakkar, EY has been on notice since *at least* February 2019 that *all* of Ryan's work papers are subject to binding and enforceable confidentiality agreements with Ryan's own clients.

5.7.    In November 2019, Ryan learned that Thakkar had begun pitching EY's federal royalty services to Ryan's clients.  During these solicitations, Thakkar indicated that he had firsthand knowledge of Ryan's confidential federal royalty work papers and that the client would be disappointed by Ryan's deliverables.  Because Thakkar had never been employed by Ryan in its federal royalty practice, his firsthand knowledge could not have come from Ryan. Rather, Ryan subsequently discovered that EY's audit group had demanded Ryan's work papers from its severance tax and federal royalty clients (in breach of Ryan's confidentiality agreements) under the guise of "auditing," only to then provide Ryan's confidential intellectual property to Thakkar. Despite having audited several of Ryan's energy clients for years, this was the first time to Ryan's knowledge that EY auditors had ever requested Ryan's confidential work papers in connection with routine audits.  That timing was not an innocent coincidence.

5.8.    Ryan's severance tax and federal royalty group has dedicated years to the development of confidential, proprietary, and trade secret models and methodologies derived from expert skills and experience, including countless interactions with state and federal tax and royalty authorities, extensive research, and mutually agreed upon guidance documents developed in collaboration with the U.S. Department of the Interior. Ryan combines its models and

methodologies with detailed data analysis to maximize recovery for or limit liability of its clients. The information contained in Ryan's work product is not commonly known, ascertainable by the general public, or readily comprehensible without the benefit of experience, both in time and money expended, and the context of the information aggregated and organized from research conducted by Ryan's employees that has provided a substantial competitive advantage for Ryan in the marketplace.

5.9.    To protect that effort, Ryan insists upon a confidentiality agreement with each client it engages, substantially similar to the following:

> Ryan's work product, including specific engagement procedures and techniques, constitutes proprietary and exclusive information, and Client further agrees not to disclose such information to any third party without obtaining prior written approval from Ryan. Further, Ryan's tax saving strategies constitute proprietary and exclusive information.

After confidentiality is ensured, Ryan and its clients work closely together, exchanging confidential and proprietary work product such as accounting work papers, schedules, and spreadsheets that Ryan and its clients maintain and protect. Ryan's clients are obligated to maintain the secrecy of Ryan's trade secret work product.  Ryan's Severance Tax and Royalty practice has never provided a written waiver authorizing EY to freely use and transmit Ryan's confidential intellectual property for any purpose—audit or otherwise.

5.10.   Ryan also requires that its employees execute confidentiality agreements or imposes restrictive covenants in employment agreements that preclude employees from soliciting business from Ryan clients for a defined period following separation from Ryan.

5.11.   Ryan's work product is intended to remain confidential and, per the engagement agreements with Ryan's clients, should not be shared with EY unless expressly permitted to do so by Ryan – a fact that has been acknowledged by EY to other Ryan clients. Similarly, and as an auditor to Ryan's clients, EY is prohibited from sharing confidential information with non-audit

EY employees outside of the attest function to verify and report that certain tax treatments accurately reflected the clients' accounting.  Likewise, under Texas law, EY must abide by the Uniform Accountancy Act, which expressly provides that it is unlawful for an accountant to offer or recommend that the client also pay for other services, such as federal royalty services, whether for commission or contingency fee, when that accountant also provides audit services to the client. Accordingly, EY was on notice that: (1) its audit teams should not share confidential information with non-attest members; and (2) based on Texas law, EY should not perform nor offer severance tax or federal royalty services for any audit client.

5.12.    Under Texas law, there is no legitimate use of stolen intellectual property.  Yet, despite being on notice that Ryan's information was protected information and that EY should not use its position as auditor to solicit non-audit work, EY's audit team accessed and acquired Ryan's confidential work product without Ryan's knowledge or consent from multiple mutual clients. To obtain the work product, EY's team requested Ryan's confidential work product from a mutual client under the guise of the documents being necessary for the team to complete the audited financials for the client. EY did this despite knowing that Ryan's work papers were subject to binding confidentiality agreements.  Because Ryan's client feared that EY would refuse to produce audited financials unless the documents were turned over, it acquiesced.  Upon information and belief, the audit team then forwarded the documents to Thakkar, who posed as a federal royalty "specialist" for the purposes of misappropriating Ryan's work product. Prior to this new auditing practice, EY had never requested Ryan's work product, yet had certified these audits without qualification.

5.13.    On information and belief, Thakkar and EY have attempted to reverse-engineer the unlawfully obtained Ryan work papers for the purposes of developing EY's fledgling federal oil

and gas royalty offerings. To Ryan's knowledge, EY did not market nor offer federal oil and gas royalty services prior to Thakkar obtaining, disseminating, and utilizing Ryan's work product, which, along with historical engagements in the industry, indicate EY does not possess the knowledge, skills, or expertise to compete with Ryan in providing federal royalty services. Thakkar's use of EY's audit services to obtain Ryan's trade secret information and market EY's severance tax and royalty services is unlawful, a breach of Thakkar's continuing obligations under the Employment Agreement, and EY is liable for Thakkar's ongoing unlawful conduct.

5.14.   Thakkar has brazenly proceeded in the marketing of Ryan's confidential, proprietary, and trade-secret information as EY's own. Thakkar has approached mutual clients, and prospective clients, indicating he has seen "Ryan's work" and offered to perform the same federal royalty services on an hourly basis. Further, on information received by Ryan, Thakkar has attempted to undermine Ryan's existing contracts with its clients by citing his review of Ryan work papers, and then defaming Ryan as doing "bad work" and alleging Ryan "hides" solutions. This is all based on Thakkar's illegal acquisition and use of Ryan's work product and is false.

5.15.   Of additional concern is Thakkar's and EY's ongoing and continued demands for Ryan clients to provide Ryan's confidential, proprietary, and trade-secret work product to EY's audit teams. By way of example, a Ryan client that acceded to EY's demand and provided EY with Ryan's confidential, proprietary, and trade-secret work product has continually been harassed by similar demands from EY's audit team and rudimentary questions relating to the client's federal royalty schedules. This unlawful behavior continues despite at least one EY audit partner acknowledging the actions and assuring that EY would address the problem internally.

5.16.   Further underscoring the illegitimate and illegal nature of the audit team's requests, another mutual client approached by EY refused to provide the requested Ryan information, citing

the confidentiality obligations and the lack of any legitimate and lawful purpose in EY's requests. After this client that refused EY's requests, EY has issued audited financials without qualification. This inconsistency between similarly situated attest EY clients proves that EY's requests for Ryan's work papers serve no legitimate audit purpose.

5.17.    EY has further misappropriated Ryan's intellectual property by exploiting it for EY's own benefit in conducting audits of EY clients.  By using Ryan's work as shortcut, EY has enjoyed substantial (and improper) economic benefit by substituting Ryan's work product for the hundreds of man-hours that would otherwise be required to certify the federal royalty entries and credits on EY client's financial statements. Accordingly, EY, Nick, and Thakkar have misappropriated Ryan trade secret information, done so in an unlawful manner, knowingly and with intent to harm Ryan. But EY's scheme of stealing Ryan's trade secrets does not stop there.

5.18.    Ryan Nick worked in Ryan's severance tax and federal royalty group and worked on certain federal royalty projects at Ryan. Notably, Ryan did not work on and has no expertise or experience in severance tax.

5.19.    Ryan Nick had an enforceable contract with Ryan that required him to maintain the confidentiality of Ryan's trade secret and confidential information. Mr. Nick received this Employment Agreement and electronically signed it on December 13, 2016. This employment agreement survives his departure from Ryan.

5.20.    On May 6, 2020, Nick announced that he was leaving Ryan to join a competitor. Ryan employees questioned Nick and asked for his assurances that he understood and would honor his confidentiality obligations to Ryan. Nick assured Ryan that he has and would honor these obligations. This representation was untrue.

5.21.    Upon finding out weeks after Nick's departure that he had joined EY, and given its grave concerns about EY's behavior, Ryan forensically examined Nick's Ryan-issued laptop. This examination revealed that Nick—contrary to his express assurances to Ryan that he had honored his confidentiality obligations—had accessed a substantial volume of confidential, proprietary, and trade-secret work product immediately prior to his departure on May 6, 2020. Much of this information was accessed between 4:20 a.m. and 4:41 a.m. on May 6, 2020—mere hours before he announced he was leaving Ryan to join EY. Nick did not normally work at this hour. None of the information Nick accessed was relevant to any projects that Nick had been assigned. In addition, a review of Nick's online activity reveals that he accessed a number of highly confidential Ryan research projects in the days immediately prior to his departure—research projects that Nick was not involved with as part of his employment, had no relevance to his work, and that were well outside the scope of his normal employment.  Finally, Nick's online history also reveals that he repeatedly attempted to access protected drives for other Ryan teams whose work solely concerns state severance tax—an area that Nick did not work in.  There was no valid business reason for any of Nick's online activity noted above.

5.22.    Upon information and belief, Ryan Nick was acting as EY's agent to acquire Ryan's confidential, proprietary, and trade secret information. Further, one of the first requests made of Nick upon his joining of EY was to review Ryan's confidential work product and provide a summary of the savings generated for Ryan's client.

5.23.    Through discovery in this case, Ryan has also learned of additional EY and Thakkar misappropriation of Ryan's confidential, proprietary, and trade secret information. The following is a sample of this new information.

5.24.   EY Indirect Tax members have had access to Ryan's internal checklists and roadmaps to find and justify sales and use tax savings. These documents are not disclosed to clients and are not publicly available. These checklists provide substantial benefit to EY.

5.25.   EY audit members who were solely responsible for auditing their clients and maintain their client's confidential information, have disclosed Ryan's fee arrangements for consulting services in severance tax, federal royalty, and sales and use taxes to members of EY's Indirect Taxes Group. Members of the Indirect Tax Group, including Thakkar, have then used this information to solicit the same work from Ryan's clients but at a lower cost based on the information that they had improperly acquired

**6.**

## VIOLATIONS OF AICPA, PCAOB, SEC, TSBPA AUDITING STANDARDS AND RULES AND AICPA CODES OF CONDUCT

6.1.    Ryan incorporates the preceding paragraphs as if fully stated herein.

6.2.    Auditors must comply with the standards, rules, and codes of conducts promulgated by the American Institute of Certified Public Accountants (AICPA). The AICPA sets ethical standards for the profession and U.S. auditing standards for audits of private companies, non-profit organizations, federal, state and local governments. For auditors of public companies, the Public Company Accounting Oversight Board (PCAOB) and the United States Securities and Exchange Commission (SEC) require auditors to comply with similar (if not identical) standards, rules, and codes of conduct.

6.3.    In Texas, the Texas State Board of Public Accountancy (TSBPA) issues and maintains licenses for individual Certified Public Accountants and firms. The TSBPA has essentially fully adopted the AICPA, PCAOB, and SEC professional standards and codes of conduct. 22 Tex. Admin Code § 501.51 *et seq* (Rules of Professional Conduct). As such, any

violation of the AICPA, PCAOB, and SEC is a violation of the TSBPA. The TSBPA has the power to rescind licenses if it finds a violations of these rules.

6.4.   Upon information and belief, the actions in this case by EY have violated the standards, rules, and codes of conduct for the AICPA, PCAOB, SEC, and TSBPA.

6.5.   <u>Independence.</u> Upon information and belief, EY has violated various rules, standards, and codes of conducts regarding independence by providing and offering to provide bookkeeping services to its auditing clients. By doing so, EY is auditing its own work, which the auditing rules do not permit EY to do. Specifically, upon information and belief, EY has performed auditing services for its clients while simultaneously actively soliciting these auditing clients to perform consulting services in the federal royalty, severance tax, and sales and uses tax space. Upon information and belief, EY has performed and is attempting to perform analyses and calculations of amounts owed in financial statements, as well as preparing the source documents supporting these amounts reflected in the financial statements, and filing the forms with the United States and states governments reflecting such analysis and related adjustments.

6.6.   Upon information and belief, these actions constitute a violation of AICPA Code of Professional Conduct 1.295.120, which explains that an auditor cannot be independent in the performance of professional services if "it prepares source documents." These actions also violate PCAOB Rule 3520, requiring a public accounting firm to be independent of the firm's audit client throughout the audit and professional engagement period." *See also* ET Section 101.05 (activities that would impair a member's independence include preparing source documents or originating data).

6.7.   Similarly, upon information and belief, these actions constitute a violation of SEC law. Under 15 U.S. Code § 78j–1(g)(1), it is "unlawful for a registered public accounting firm (and

any associated person of that firm) . . . to provide to that [company], contemporaneously with the audit, any non-audit service, including—*bookkeeping or other services related to the accounting records or financial statements of the audit client*." (emphasis added). These actions constitute a violation of SEC Regulations. *See* 17 C.F.R. § 210.2–01(2) (the Commission scrutinizes when the rendering of services "places the accountant in the position of auditing his or her own work"); *accord* § 210.2–01(c)(4) ("An accountant is not independent if, at any point during the audit and professional engagement period, the accountant provides . . . (i) Bookkeeping or other services related to the accounting records or financial statements of the audit client").

6.8.    Upon information and belief, EY has also violated AICPA Codes of Conduct, which applies to both public and private company audits.

6.9.    <u>Confidentiality.</u> Upon information and belief, EY has violated codes of conducts regarding maintaining the confidentiality of its audit client's information by disclosing to non-attest departments of EY and third parties to solicit their business the confidential client information and Ryan information that the clients have entrusted Ryan to keep confidential. Upon information and belief EY auditors have disclosed Ryan's and its clients' confidential information (including fee arrangements and work papers and reports reflecting Ryan's methodologies and approaches) to Indirect Tax members who provide royalty and tax consulting services while aware of Ryan's confidentiality terms.

6.10.    Upon information and belief, this violates AICPA Code of Professional Conduct Rule 1.700.001.01, which prohibits an auditor from "disclos[ing] confidential client information without the specific consent of the client."

6.11.    <u>Objectivity, Integrity, and Conflicts of Interest.</u>  Upon information and belief, EY has also violated various rules, standards, and codes of conducts regarding maintaining integrity

and objectivity by (i) demanding or taking from its auditing clients without their knowledge or consent Ryan's confidential workpapers and project reports when they were not necessary to complete audits; (ii) using Ryan's confidential work papers and project reports to gain an advantage in marketplace by trying to win consulting work from Ryan and using them as a roadmap to find future savings; and (iii) using its auditing relationships to solicit non-attest work and pressure clients that use Ryan in the federal royalty, severance tax, and sales and use tax space to leave Ryan and allow EY's Indirect Tax group to start providing the same services.

6.12. Upon information and belief, these actions violate AICPA Code of Conduct 1.100.001.01 which requires that "[i]n the performance of any professional service, a member shall maintain objectivity and integrity [and] shall be free of conflicts of interest."

**7.**

## COUNT I: MISAPPROPRIATION OF TRADE SECRETS

7.1. Ryan incorporates the preceding paragraphs as if fully stated herein.

7.2. Thakkar and Nick, on behalf of EY, as early as Thakkar's first day at EY, illegally acquired and are using Ryan's confidential, proprietary, and trade secret information to improperly compete against Ryan in violation of the Texas Uniform Trade Secret Act ("TUTSA"). Ryan's confidential and proprietary methodologies derive substantial, independent economic value from not being generally known to the public or to its competitors, who could obtain economic value from this information. Ryan expended significant financial and human resources to obtain and develop this information, which cannot be easily acquired or replicated by others. Moreover, Ryan has taken substantial efforts to maintain the secrecy of this information, including, but not limited to, restricting access to such information, designating such information as confidential, and requiring confidentiality agreements. As such, Ryan's confidential and proprietary information constitutes trade secrets pursuant to TUTSA and common law.

7.3.    EY and Thakkar misappropriated Ryan's trade secret information and knew or had reason to know the use or disclosure of the trade secret information was unlawful and in violation of Thakkar's Employment Agreement.   EY has continued to improperly exploit Ryan's confidential intellectual property in conducting audits, soliciting Ryan clients, and creating a competing an indirect tax practice group focused on severance taxes, federal royalty, and sales and use taxes whose know-how and methodologies have been stolen from trade secrets that Ryan spent more than a decade developing.

7.4.    Ryan was injured and continues to be injured as a direct result of Thakkar's and EY's ongoing conduct and therefore seeks actual damages (including, but not limited to, lost profits), fee forfeiture and disgorgement, a constructive trust (and other equitable remedies).

7.5.    Thakkar's and EY's misappropriation of trade secrets was willful and malicious and thus justifies an award of exemplary damages, which Ryan also seeks.

**8.**

**COUNT II: TORTIOUS INTERFERENCE WITH CONTRACT**

8.1.    Ryan incorporates the preceding paragraphs as if fully stated herein.

8.2.    EY is liable to Ryan for tortiously interfering with Ryan's present and prospective business relationships with Ryan clients and Ryan's agreements with its employees to maintain confidentiality.

8.3.    Ryan's agreements with its clients and employees are valid and enforceable contracts.

8.4.    EY's tortious interference was and continues to be a proximate cause of damages to Ryan, which continues to accrue and cause irreparable harm to Ryan.

8.5.    EY's and Thakkar's conduct was malicious and carried out with such intent that it justifies the imposition of punitive damages against EY sufficient to punish and deter EY from

similar conduct in the future.

**9.**

**COUNT III: BREACH OF CONTRACT**

9.1.    Ryan incorporates the preceding paragraphs as if fully stated herein.

9.2.    The Employment Agreement constitutes a valid and binding contract, which obligated Thakkar to not disclose confidential information received in the course of his employment. Thakkar's obligations under the Employment Agreement to not disclose confidential information did not terminate on his resignation, nor on the expiration of his non-compete term.

9.3.    Ryan as successor to SOC possesses the right to enforce the Employment Agreement.

9.4.    Thakkar has materially breached the Employment Agreement by disclosing Ryan's confidential information.

9.5.    Thakkar's breach of the Employment Agreement caused injury to Ryan.

9.6.    As a direct result of Thakkar's breach of the Employment Agreement, Ryan seeks damages to be proven in excess of $1,000,000.

**10.**

**PERMANENT INJUNCTION**

10.1.    Ryan incorporates the preceding paragraphs as if fully stated herein.

10.2.    Due to Defendants' conduct set out above, Ryan is threatened with imminent harm and irreparable injury. Ryan is threatened with imminent harm because Defendants abused its audit relationships to: a) misappropriate customer relationships belonging to Ryan; b) misappropriate confidential information and trade secrets belonging to Ryan related to Ryan's provision of severance tax and federal oil and gas royalty services, customer relationships, and other matters; and c) usurp business opportunities belonging to Ryan. This wrongful conduct has already harmed

-18-

Ryan considerably. Given the events already past, and the course of conduct currently unfolding, this harm is likely to greatly increase in the immediate future if Defendants are not enjoined as requested herein. Among other things, Ryan has and will likely continue to lose confidential and proprietary processes, methodologies, information and trade secrets, in addition to loss of business and suffer a loss of goodwill and customer relationships

10.3.    Ryan is also threatened with irreparable injury. As set forth above, if Defendants are not enjoined as requested herein, Ryan's confidential and proprietary processes and methodologies and trade secrets will be learned and deployed by a competitor, causing a loss of goodwill and untold future customers. Additionally, confidential information belonging to Ryan is likely to be used to unlawfully compete with Ryan. These circumstances give Defendants an unfair advantage over Ryan in the marketplace, which have and will continue to harm Ryan's relationships with customers. The full economic damage caused by this activity will be difficult or impossible to fully calculate.

10.4.    If Defendants are not enjoined as requested herein, Ryan will have no adequate remedy at law. Even if monetary damages are awarded, they will not undo the damage and ongoing harm caused by Defendants continuing to use Ryan's confidential and proprietary knowledge, methodologies, and trade secrets to unlawfully disrupt Ryan's business. Also, as noted above, the economic harm Ryan will suffer will be difficult or impossible to fully calculate. Additionally, Defendant Thakkar is unlikely to be able to pay a judgment for damages for the harm Ryan is likely to suffer. Consequently, the potential recovery of a monetary judgment after trial will not make Ryan whole and will not be an adequate remedy at law.

10.5.    On June 19, 2020, the Court entered a temporary restraining order.  On July 10, 2020, the Court modified the temporary restraining order.  On July 23, 2020, the Court entered an Agreed Temporary Injunction that shall remain in effect until a trial on the merits.

10.6.    Based on the foregoing, Ryan seeks a permanent injunction prohibiting Defendants from directly or indirectly, alone or in conjunction with others, from the date of the permanent injunction order:

   a.   Retaining, using, or disclosing any of Ryan's confidential and/or proprietary information obtained from Ryan and Ryan's customers, including, but not limited to, Ryan's work papers reflecting Ryan's severance and sales and use tax work and calculations and Ryan's federal oil and gas royalties work and calculations.  Defendants must return to Ryan or Ryan's customers all of Ryan's confidential information and work papers relating reflecting Ryan's severance and sales and use tax work and calculations and Ryan's federal oil and gas royalties work and calculations;

   b.   seeking any Ryan work papers, or any other confidential and proprietary Ryan information from Ryan's customers for purposes of conducting an audit or providing severance and sales and use tax or federal oil and gas royalties services;

   c.   seeking any Ryan work papers or any other confidential and proprietary Ryan information from current or former Ryan employees without the express written consent of Ryan; and

   d.   certifying on a quarterly basis to Ryan that it has complied with the Permanent Injunction for a period of 10 years.

10.7.    Ryan requests that this injunction be binding upon the named enjoined persons, and to their officers, agents, representatives, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual or constructive notice of the injunction by personal service or otherwise.

## 11.

## ATTORNEY'S FEES

11.1.    Ryan incorporates the preceding paragraphs as if fully stated herein.

11.2.    Pursuant to Texas Civil Practice and Remedies Code §§ 38.0001, 134A.003 – .005,

Ryan is entitled to recover its reasonable attorneys' fees and expenses incurred in prosecuting its claims against EY and Thakkar.

11.3.   Ryan has performed the conditions precedent necessary for the recovery of attorneys' fees from EY and Thakkar.

## 12.

## RESPONDEAT SUPERIOR

12.1.   Ryan incorporates the preceding paragraphs as if fully stated herein.

12.2.   All of Thakkar's and Nick's conduct alleged herein has occurred in the course and scope of his employment with EY, and EY had knowledge and supported all conduct alleged herein.

## 13.

## CONDITIONS PRECEDENT

13.1.   All conditions precedent to Ryan's right to recover on the claims and recover attorneys' fees stated herein were met, otherwise occurred, or were waived.

## 14.

## RESERVATION OF RIGHTS

14.1.   Ryan reserves its rights under Texas law to assert additional claims and remedies, including additional temporary or permanent injunctive relief.

## 15.

## JURY DEMAND

15.1   Ryan demands a jury trial and tenders the appropriate fee with this Petition.

## PRAYER

WHEREFORE, Ryan respectfully requests that Defendants be cited to appear and on final trial that the Court enter judgment for Ryan for recovery from Defendants for injunctive relief and for Ryan's actual damages, reasonable and necessary attorneys' fees, costs of court, pre- and post-judgment interest at the maximum rate allowed by law, and all such other and further relief, both general and special, at law or in equity, to which Ryan may show itself to be justly entitled.

Dated: August 19, 2020

Respectfully submitted,

**AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI & MENSING, PC**

 */s/ Todd Mensing*
Todd Mensing
Texas Bar No. 24013156
tmensing@azalaw.com
Foster Johnson
Texas Bar No. 24076463
fjohnson@azalaw.com
Monica Uddin
Texas Bar No. 24075195
muddin@azalaw.com
Paul Turkevich
Texas Bar. No. 24102585
pturkevich@azalaw.com
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 – Phone
(713) 655-0062 – Fax

**ATTORNEYS FOR RYAN, LLC**